UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GILBERT ASSOKO, et al.,                            06 Civ. 11414 (RJH)

        Plaintiffs,                     **MEMORANDUM OPINION**
                                                    **AND ORDER**

   - against -

CITY OF NEW YORK, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      In this action, seventeen homeowners ("Plaintiffs") bring suit alleging a series of constitutional violations and state law torts against various public and private defendants arising out of the purchase of government-subsidized homes located in central Harlem in Manhattan. Defendants City of New York, New York City Department of Housing Preservation and Development, and Department of Buildings of the City of New York (collectively, the "City"); NYC Partnership Housing Development Fund Company ("the Partnership"); and Danois Architects ("Danois") separately move to dismiss Plaintiffs' Complaint under Rules 9(b) and 12(b)(1) and (6) of the Federal Rules of Civil Procedure. For the reasons that follow, these motions are granted.

## BACKGROUND

      The facts, as stated in Plaintiffs' Complaint, are as follows. At some point prior to 2003, the New York City Department of Housing Preservation and Development ("HPD") and the Partnership, a non-profit organization dedicated to increasing the availability of affordable housing and home ownership among lower income residents, selected defendants Melrose Place Housing Corporation, Velez Equities, and the Velez

Organization to build the Madison Park Partnership Homes ("Madison Park"). (Compl. ¶¶ 25, 28.) Madison Park is comprised of several townhomes built on various blocks throughout Central Harlem. (Compl. ¶ 29.) One or more of the defendants contracted with Danois to design the homes. (Compl. ¶ 26.) Construction on Madison Park began approximately in 2003, at which time advertisements for the development were distributed and publicized. (Compl. ¶ 26.). Plaintiffs applied and were selected to participate in the program, entering into purchase agreements with the Velez Organization and the Partnership and making "substantial deposits on their contracts."[1] (Compl. ¶¶ 31–32.) Plaintiffs were then "steered to [defendant Citibank Corp.] for financing and forced to use the Velez Organization's own engineers and attorneys." (Compl. ¶ 35.) Plaintiffs were not involved in the design or construction of Madison Park. (Compl. ¶ 27.)

Plaintiffs allege that their requests for independent attorneys and engineers were denied by the City and the Velez Organization. (Compl. ¶ 35.) It is not clear from the Complaint whether Plaintiffs merely requested permission to utilize independent attorneys and engineers at Plaintiffs' own expense or requested that the City and/or the Velez Organization provide such professionals without charge.

Upon completion of the homes in 2004, Plaintiffs allege that the City conducted inadequate inspections of the homes and wrongfully issued Certificates of Occupancy ("Certificates"). (Compl. ¶ 68.) After the Certificates issued, each Plaintiff was

---

[1] Although Plaintiffs do not attach the purchase agreements to the complaint, they rely on the agreements in several causes of action and thus the Court may consider them in connection with these Rule 12(b)(6) motions. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effects,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

"scurried through the inspection and rushed off to a closing where [he or she was] faced with a number of non-negotiable terms and unexpected last minute fees." (Compl. ¶ 36.) However, the terms of the closing were set forth in the purchase agreements, which had been signed by Plaintiffs a year earlier. (Compl. ¶¶ 31–32.)

Upon entering the premises, Plaintiffs discovered numerous defects requiring substantial outlays of money for repair. (Compl. ¶¶ 39–54.) Defects included, among other things, deteriorating roofs and masonry, improper plumbing, uneven heating, and electrical problems. (Compl. ¶¶ 39–54.) The Velez Organization—which had exclusively managed the design and construction process—and the Partnership, in their Purchase Agreements, had provided limited warranties of between one to six years duration. (Compl. ¶¶ 31, 55.) Despite numerous complaints, however, the defendants did little to nothing to remedy the defects.[2] (Compl. ¶¶ 56–57.) Plaintiffs next organized into an informal Homeowners Organization but achieved little more than they had in their individual capacities. (Compl. ¶¶ 59–60.) They requested the original plans and specifications for their homes in order to assess the conditions of Madison Park but to date have received only "rudimentary blueprint type plans that do not specify the material and building requirements set forth in the engineer's plans." (Compl. ¶¶ 61–62.) Plaintiffs were forced to incur the costs to repair their new homes. (Compl. ¶ 75.)

Plaintiffs further allege that the City "repeatedly refused to inspect" their buildings and notice the many defects, and "refus[ed] and . . . fail[ed] to enforce" housing provisions "intended to ensure the maintenance of safe and healthy housing for New York City residents." (Compl. ¶¶ 70, 72.) Because HPD, the responsible city agency, has failed to enforce housing standards, Plaintiffs, "unlike homeowners in wealthier,

---

[2] Defendants Velez Organization have not answered or otherwise responded to the complaint.

predominately White neighborhoods, have no agency . . . for securing the protections of the housing laws." (Compl. ¶ 78.)

Based on these allegations, Plaintiffs contend that the Velez Organization, Danois, Citibank, the City, and the Partnership "expressly and impliedly represented and warranted" that the homes were fit for human habitation and "fraudulently induc[ed] them into purchasing and mortgaging defective Townhouses." (Compl. ¶¶ 63, 64).

Plaintiffs' Complaint recites twelve causes of action. Plaintiffs assert that the City has violated Plaintiffs' rights under the Equal Protection Clause (Compl. ¶¶ 67–76 ("First Cause of Action"))[3] and Due Process Clause (Compl. ¶¶ 77–80 ("Second Cause of Action")). Plaintiffs further assert that the City and the Partnership have violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (2006).[4] (Compl. ¶¶ 110–16 ("Ninth Cause of Action").) The remaining causes of action assert state law claims sounding in fraud, breach of contract, city and state discrimination law, and state business law.

**STANDARD OF REVIEW**

When considering a motion to dismiss under Rule 12(b)(6), the Court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted). Pursuant to Fed. R. Civ. P. Rule 8(a), the complaint must

---

[3] It is unclear whether Plaintiffs seek to assert their "First Cause of Action," for violation of the Equal Protection Clause, against the Partnership. The heading for this cause of action indicates that the City is the only defendant against whom it is being asserted. (Compl. ¶ 14.) However, under this heading, in paragraph 68 of their Complaint, Plaintiffs allege that the Partnership has "wrongfully, knowingly and intentionally, conducted inadequate inspections of Madison Park and issued a certificate of occupancy on the Townhouses." (Compl. ¶ 68.) Neither Plaintiffs nor the Partnership addressed the claim in their briefs. However, even if Plaintiffs assert their equal protection claim against the Partnership, this claim would fail. Assuming, *arguendo*, that the Partnership could be properly characterized as a state actor, the claim fails for the reasons enumerated in Part I.A.

[4] While Plaintiffs, in their Complaint, assert the "Ninth Cause of Action" against all defendants, Plaintiffs concede in their reply to defendant Danois's motion to dismiss that this claim is not viable against Danois. (Pls.' Mem. Opp'n to Def. Danois Mot. for Summ. J. 10.)

4

include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Conley v. Gibson*, 355 U.S. 41, 47 (1957) (complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."). The complaint "does not need detailed factual allegations," yet it "requires more than labels and conclusions, and a formalistic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964–65 (2007). Rather, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965; *see also Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007) (plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.").

The Court is generally limited to "the factual allegations in . . . [the] complaint, . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Because Plaintiffs rely on the purchase agreements in bringing suit, the Court may consider them on this motion.

## DISCUSSION

### I.     Constitutional Claims

The first and second causes of action allege various constitutional claims against the City. Plaintiffs allege that they have been deprived of the "right to safe and suitable housing" and of the "rights, privileges and immunities secured" by the Constitution

(Compl. ¶¶ 72–73); plaintiffs specifically allege violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The Court interprets these claims as being brought pursuant to 42 U.S.C. § 1983 for the violation of constitutional rights by state actors.[5] Section 1983 "is not itself a source of substantive rights" but "merely provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (citations and internal quotation marks omitted). The two federal rights arguably implicated by Plaintiffs' Complaint are the right to equal protection and the right to due process. The Court addresses each in turn.

### A. Equal Protection

Plaintiffs' first cause of action alleges that the City violated the Equal Protection Clause of the Fourteenth Amendment by failing to enforce "virtually every significant statutory provision intended to ensure the maintenance of safe and healthy housing," "conduct[ing] inadequate inspections . . . and issu[ing] a certificate of occupancy." (Compl. ¶¶ 68, 72.) They also rest this claim on the continued refusal "to inspect Plaintiff's buildings, notice the many egregious defects and violations present, or ensure that effective and adequate repairs are completed." (Compl. ¶ 70.) Plaintiffs vaguely allege that the "ownership pool" of the Madison Park houses is comprised "predominately of minorities." (Compl. ¶ 65.) However, no plaintiff alleges that he or she is a minority or if so, to what protected class he or she belongs.

---

[5] 42 U.S.C. § 1983 provides: "Every person who, under color of [law] . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

The Equal Protection Clause requires the government to treat all similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). While the typical equal protection claim concerns discrimination based on membership in a protected class, where, as here, a plaintiff does not actually allege membership in such a class,[6] she can still prevail under a "class of one" equal protection claim. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In the Second Circuit, to state a "class of one" claim under *Olech*, Plaintiffs must allege: (1) that they were intentionally treated differently from other similarly situated individuals; and (2) that the disparate treatment was either (a) "irrational and wholly arbitrary" or (b) motivated by animus.[7] *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). Plaintiffs fail to satisfy either prong.

First, Plaintiffs fail to specifically identify what actions defendants wrongfully took or neglected to take with respect to each individual plaintiff. The instant action is not a class action and each plaintiff must make individualized factual allegations that identify the treatment that he or she claims was disparate. To the extent the equal protection claim is based on the wrongful issuance of a Certificate, or the derivative failure to conduct proper inspections prior to the issuance of the Certificate, individual

---

[6] While Plaintiffs make vague allegations that they are minorities (*see* Compl. ¶¶ 118–20), they do so in the context of causes of action relying on New York state anti-discrimination laws and in their opposition brief rely on a "class of one" equal protection claim. In any event, they cannot state an equal protection claim on the grounds of race because they fail to allege that any differential treatment was based on their membership in a protected class. *See LaTrieste Rest. & Cabaret v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (necessary element of equal protection claim is that differential treatment was based on "impermissible considerations such as race").

[7] A selective enforcement equal protection claim based on a showing of animus or "malicious or bad faith intent" was available even before *Olech* created a class of one equal protection claim based on "irrational and wholly arbitrary" governmental conduct. While the Second Circuit has repeatedly deferred the question of whether *Olech* eliminated the inquiry into defendant's bad faith intent, *see Harlen*, 273 F.3d at 499–500, district courts have generally assumed that it did and allowed a "class of one" claim to proceed based only on the government's arbitrary conduct. *See, e.g.*, *Morningside Supermarket Corp. v. NY State Dep't of Health*, 432 F. Supp. 2d 334, 340–42 (S.D.N.Y. 2006).

Plaintiffs have not adequately alleged such conduct. While each plaintiff lists defects in his or her own property (*see* Compl. ¶¶ 42–54), they do not allege, as they must, that such defects existed at the time of the inspection and issuance of the Certificate and should have precluded the issuance of the Certificate in each instance. To the extent the equal protection claim is based on the failure of the City to perform inspections of Plaintiffs' properties after they took possession, Plaintiffs cannot claim any injury-in-fact resulting from the HPD's failure to issue citations against Plaintiffs themselves. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). Therefore, they lack standing to assert a claim that the City failed to enforce housing regulations after they occupied the townhouses.

Second, Plaintiffs fail to adequately identify any similarly situated individuals who were treated differently. In a class of one claim, "the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100, 104–05 (2d Cir. 2005) (describing standard as "whether they are *prima facie* identical"). The Court notes, however, that at the pleading stage, a plaintiff need not identify "actual instances where others have been treated differently"; it is sufficient to make more general allegations that similarly situated people have been treated differently. *DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir. 2003); *see also Cohn v. New Paltz Cent. Sch. Dist.*, 171 Fed. Appx. 877, 879 (2d Cir. 2006). Nevertheless, the only allegation even suggesting a similarly situated class states that "unlike homeowners in wealthier, predominately White neighborhoods, [Plaintiffs] have no agency . . . for securing the protections of the housing laws." (Compl. ¶ 78.) Even under a generalized pleading standard, such a tangential allegation clearly fails to

identify any similarly situated individuals who were treated differently. Absent from Plaintiffs' Complaint are any direct allegations that the City declined to issue Certificates with respect to other homes that suffered from the same defects as did Plaintiffs' homes. This complete failure to allege actual disparate treatment with respect to a similarly situated class is grounds for dismissing the equal protection claim.[8] *See Colandrea v. Town of Orangetown*, 490 F. Supp. 2d 342, 349 (S.D.N.Y. 2007) ("Plaintiff's equal protection claim here fails because the complaint fails to allege any similarly situated class of persons with respect to whom she was treated differently."); *O'Bradovich v. Village of Tuckahoe*, 325 F. Supp. 2d 413, 431 (S.D.N.Y. 2004) (dismissing equal protection claim where "complaint does not allege that Plaintiffs were similarly situated compared to the other citizens who were" treated differently).

Third, "class of one" plaintiffs must show "intentional disparate treatment," i.e., that defendants "knew that they were treating [plaintiffs] differently from anyone else." *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001). There are no allegations whatsoever suggesting that the City knew the identity of Plaintiffs or had any knowledge that housing regulations were being enforced differently as to them. Plaintiffs merely allege that the City "wrongfully, knowingly and intentionally" conducted inadequate inspections and issued Certificates. (Compl. ¶ 68.) While this allegation may be sufficient to suggest that the City intentionally treated them in the ways alleged, it is

---

[8] In some cases, a court can infer from specific factual allegations that a plaintiff was treated differently from other similarly situated individuals even where not directly stated. *See DeMuria*, 328 F.3d at 707 (sustaining complaint in which plaintiffs stated that they were subjected to different standard of police protection than that afforded to other residents *and* where factual allegations supported conclusion that defendant's conduct was in violation of his duties as police officer). In this case, however, Plaintiffs have made no such factual allegations from which the Court could infer that the City was treating them differently from other similarly situated New York City residents. Generalized allegations that Plaintiffs "have no agency . . . for securing the protections of housing laws" is not a substitute for allegations of actual disparate treatment. (Compl. ¶ 76.)

9

an insufficient allegation that the City intentionally treated them differently from anyone else (whoever that may be). Nor are there any factual allegations in the Complaint from which it can be inferred that the disparate treatment was imposed intentionally. *See Cohn*, 171 Fed. Appx. at 879–80 (reading complaint that included allegations regarding disparate treatment of similarly situated individuals as sufficiently alleging that such "differential treatment was imposed intentionally").

Finally, and most importantly, Plaintiffs fail to allege that the governmental action was "irrational and wholly arbitrary" or motivated by animus toward Plaintiffs. Plaintiffs have not alleged, even in conclusory terms, that there was no rational basis for any difference in treatment in enforcing housing regulations. Nor have they alleged that the difference in treatment in enforcing housing regulations was the product of "malicious or bad faith intent to injure" them. *LaTrieste Rest. & Cabaret v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609 (2d Cir. 1980)). Plaintiffs' bare allegation, in the context of seeking punitive damages, that the City's conduct was "intentional, willful, wanton, reckless, and malicious" is insufficient. (Compl. ¶ 76.) Plaintiffs' equal protection claim must fail in the absence of allegations by each plaintiff as to what conduct is at issue, what similarly situated individuals were treated differently, and how the City's conduct was irrational or motivated by animus.[9] Therefore, the Court dismisses Plaintiffs' equal protection claim against the City.

### B. Substantive Due Process

In order to state a substantive due process claim for deprivation of property, "a party must *first* establish that he had a valid 'property interest' in a benefit that was

---

[9] The Court notes again that the present action is not a class action and individual plaintiffs are not relieved from the pleading requirements necessary to support each of their individual claims.

entitled to constitutional protection." *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 211–12 (2d Cir. 1988)); *see also West Farms Assoc. v. State Traffic Com.*, 951 F.2d 469, 472 (2d Cir. 1991) ("[A] plaintiff may not successfully claim a deprivation of property without due process absent the identification of a protected property interest.").[10]  For a property interest to be protected by the Due Process Clause, "a person clearly must have more than an abstract need or desire for it," or even a "unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Harlen Assocs.*, 273 F.3d at 503–04 (applying a "strict entitlement test").  Such entitlement must be created and defined by sources independent of the Constitution, such as state or local law.  *See Bd. of Regents*, 408 U.S. at 577.

The analysis as to whether a plaintiff has a "legitimate claim of entitlement" to a particular benefit "must focus primarily on the degree of discretion enjoyed by the issuing authority, not the estimated probability that the authority will act favorably in a particular case." *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989); *see also Zahra*, 48 F.3d at 680 ("[A]nalysis focuses on the extent to which the deciding authority may exercise *discretion* in arriving at a decision.").  "Where a regulator has discretion with regard to the benefit at issue, there normally is no entitlement to that benefit." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994); *see also Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) ("[C]lear entitlement, and, in turn, a constitutionally protected property interest, exists only when 'the discretion of the issuing agency is so narrowly circumscribed that

---

[10] The second element, which the Court does not reach in its analysis, requires that "the defendants infringed that property interest in an arbitrary or irrational manner." *Harlen Assocs.*, 273 F.3d at 503.

approval of a proper application is virtually assured.'" (quoting *RRI Realty Corp.*, 870 F.2d at 918)). The question of whether there exists a protected property interest is typically a matter of law for the court to decide. *RRI Realty Corp.*, 870 F.2d at 918.

The allegations in the Complaint identify two distinct roles played by the City, as developer and regulator. The Complaint apparently bases the due process claim on the latter role. While not clearly articulated, Plaintiffs appear to argue that the New York City Charter creates a property interest in (1) proper enforcement of housing regulations and adequate home inspections, and (2) issuance of Certificates only upon compliance with applicable regulations.

### 1. Property Interest in Enforcement of Regulations and Execution of Building Inspections

Plaintiffs allege an "utter failure [by the City] to enforce on Plaintiffs' behalf virtually every significant statutory provision intended to ensure the maintenance of safe and healthy housing" and describe "a clear right to the City's enforcement of the housing ordinances, regulations and laws." (Compl. ¶¶ 69, 72.) They further allege that the City "conducted inadequate inspections" and "refused to inspect Plaintiffs' buildings." (Compl. ¶¶ 68, 70.) Plaintiffs contend that the independent source of this protected property interest is New York City Charter ("Charter") § 643, which provides: "The [D]epartment [of Buildings] shall enforce, with respect to buildings and structures, such provisions of the building code . . . and other laws, rules and regulations as may govern the construction, alteration, maintenance, use, occupancy, safety, sanitary conditions, mechanical equipment and inspection of buildings or structures in the city. . . ." (Pls.' Mem. Opp'n Defs' City Mot. Dismiss 6–7.)

Because the Charter does not deprive the City of all discretion in the enforcement of housing regulations and the performance of building inspection, it does not create a protected property interest. *See Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 176 (2d Cir. 1991) ("Discretion over the conferral of a governmental benefit . . . is fatal to a claim of entitlement to that benefit."). The Charter is merely a general grant of authority, outlining the "functions" of the Department of Buildings; it does not impose a non-discretionary duty to perform a certain number or quality of inspections, or enforce each and every building regulation and provision in any particular way.[11] Under Plaintiffs' logic, each time an agency, whose duties are defined in the Charter, fails to satisfy an obligation or improperly undertakes a responsibility, it constitutes a due process claim. The Constitution does not support such an invasion of the daily workings of elected officials and administrative agencies. Instead, "[g]overnment officials . . . generally are given broad discretion in their decisions whether to undertake enforcement actions." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994); *cf. DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 (1988) ("The [Due Process] Clause is phrased as a limitation on the state's power to act, not as a guarantee of certain minimal levels of safety and security."). Therefore, Plaintiffs fail to state a due process claim based on these allegations.

---

[11] Even if this regulation established a generalized obligation to enforce regulations or perform inspections, it does not create an absolute duty running to individual plaintiffs. *See Wooters v. Jornlin*, 477 F. Supp. 1140, 1146, 1148 (D. Del. 1979) (dismissing due process claim based on failure to competently perform housing inspection because there was neither an absolute duty to perform the inspections, nor a duty owed to the individual plaintiffs); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law.").

## 2. Property Interest in Non-Issuance of Certificates of Occupancy

Next, Plaintiffs allege that the City violated their due process rights by improperly "issu[ing] a certificate of occupancy on the Townhouses despite the existence of major structural deficiencies located throughout the building." (Compl. ¶ 68.) Again, Plaintiffs argue that their "legitimate claim of entitlement" derives from the Charter, which bestows on the Commissioner of the Department of Buildings the power "to issue certificates of occupancy for any building or structure situated in the city, provided that . . . a certificate of occupancy of a building or structure shall certify that such building or structure conforms to the requirements of all laws, rules, regulations and orders applicable to it. . . ." N.Y.C. Charter § 645(3)(d). While Plaintiffs refer to the wrong source, they appear to be correct that a Certificate may not issue except to a properly constructed home. The New York Building Code provides for a Certificate to be issued "[i]f the building is entitled to the certificate of occupancy . . . . Otherwise, the application shall be rejected." N.Y.C. Admin. Code 27-222(a). If a building does not conform to the requirements for a Certificate, the Commissioner has no discretion to issue one. *See Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 262 (1983) (acknowledging town's potential liability if it issued certificates of occupancy despite "known, blatant, and dangerous violations" on premises). For purposes of the motion to dismiss, the Court assumes that the wrongful issuance of a Certificate violates municipal code.

However, "the mere violation of a state law does not automatically give rise to a violation of federal constitutional rights." *Zahra*, 48 F.3d at 682. A plaintiff can claim a due process violation where a Certificate was wrongfully *withheld*, at least where the plaintiff can show a clear entitlement to a Certificate under state law. *See O'Mara v.*

*Town of Wappinger*, 485 F.3d 693, 700 (2d Cir. 2007) (recognizing but denying substantive due process claim because plaintiff failed to show clear entitlement to issuance of certificate of occupancy). The injury in such a case is apparent; where a Certificate is withheld, the owner of a property is affirmatively deprived of the use of the property by the government. *See, e.g.*, N.Y.C. Admin. Code § 26-222 ("It shall be unlawful to occupy or use any building . . . unless and until a certificate of occupancy shall have been issued by the commissioner. . . .").

In contrast, Plaintiffs here allege that the City wrongfully *issued* Certificates,[12] allowing them to purchase defective homes. This claim cannot sustain a substantive due process violation because the issuance of a Certificate, even if in violation of municipal code, does not cause an injury attributable to the government that rises to a constitutional level. Unlike the case where a Certificate is wrongfully withheld, the City did not affirmatively deny Plaintiffs any benefit or cause Plaintiffs any harm. If the city had withheld the Certificates, plaintiffs would not, as they claim, have received a house built to code, but rather would not have been able to purchase the home at all. Plaintiffs' alleged injuries were the product of defective construction of the homes, and the breach of contract by the developer, not the actions of the government. Plaintiffs' claim proceeds on the flawed assumption that the issuance of a Certificate makes a municipality *constitutionally* responsible for all harms flowing from defects in a building, even if

---

[12] Not surprisingly, there are few due process claims based on the wrongful issuance of certificates of occupancy. In one such case, *Bletter v. Inc. Vill. of Westhampton Beach*, 88 F. Supp. 2d 21 (E.D.N.Y. 2000), the court denied such a claim, although it did so after reinterpreting it as a claim of a property interest in proper certification procedures. *Id.* at 25. Citing *Zahra*, the court found that there is no property interest in the procedures leading up to the issuance of a certificate of occupancy. *Id.* at 25–26.

15

caused by private parties. This is simply not the case.[13] A municipality is responsible for injuries caused by its actions, and even the wrongful issuance of a Certificate does not cause an injury to the recipient attributable to the government, let alone an injury rising to a constitutional level. To the contrary, it bestows a clear benefit on the recipient. Therefore, the wrongful issuance of a Certificate, even if in violation of municipal code, does not amount to a due process violation.[14]

## II. Title VI of the Civil Rights Act

Section 601 of Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Plaintiffs fail to state a claim under Title VI for several reasons.

First, Plaintiffs state only that they were "targeted by the defendants because of their race, color, and national origin." (Compl. ¶ 112.) They fail to specify to which protected category, if any, each plaintiff belongs. Second, Plaintiffs allege that they "received government funded subsidies to purchase the Townhouses." (Compl. ¶ 111.) They fail to specify what federally funded program or activity discriminated against them. The sole mention of federal funds in the Complaint is the allegation that "Citibank

---

[13] While the city may not be *constitutionally* liable for plaintiffs' alleged injuries, it is possible that plaintiff could have a state remedy. Plaintiffs could seek redress under state tort law for foreseeable injury flowing from the wrongful issuance of a Certificate. *See Garrett*, 58 N.Y.2d at 261–63 (reversing dismissal of complaint by property owners seeking damages from town for foreseeable injuries flowing from issuance of a certificate of occupancy despite "known, blatant, and dangerous violations"); *Hill v. Middleton*, 549 N.Y.S.2d 918, 920 (N.Y. Sup. Ct. 1989) (denying motion to dismiss tort claim against municipality for negligently issuing certificate of occupancy).

[14] Even if the Court found that Plaintiffs had a protected property interest in the non-issuance of a Certificate, they have failed to adequately allege that this property interest was infringed in an "arbitrary and irrational manner." *Harlen Assocs.*, 273 F.3d at 503. Because this is not a class action, each plaintiff must individually claim that because of certain enumerated defects present at the time that the Cerificate issued, the issuance of the Certificate was arbitrary and irrational. No such allegations are found in the Complaint.

provided federally funded mortgages to the purchasers of the Townhouses through Madison Park Townhouses." (Compl. ¶ 34; *see also* Compl. ¶ 111 ("Plaintiffs received government funded subsidies to purchase the Townhouses.").) Citibank's issuance of loans to Plaintiffs obviously cannot be considered discrimination against, or a denial of benefits to, Plaintiffs by the City or the Partnership.

Finally, Plaintiffs do not allege in what manner the City or the Partnership[15] intentionally subjected them to discrimination or denied them benefits because of their membership in a protected category. *See New York Urban League v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995) (Section 601 "only prohibits *intentional* discrimination"). All of Plaintiffs' allegations to this effect are entirely conclusory. (*See* Compl. ¶¶ 64 (defendants "discriminated against the Plaintiffs by fraudulently inducing them into purchasing and mortgaging defective Townhouses"), 120 (defendants "neglected their duties under the law and engage[d] in . . . blatant discriminatory conduct"), 123 (defendants "intentionally discriminated against Plaintiffs based on national origin"), 128 ("Defendants discriminated against Plaintiffs . . . in the terms, conditions, or privileges of the sale of housing accommodations and/or the furnishing of facilities or services in connection therewith . . .").) Most of these allegations do not even state that this "discriminatory" conduct was based on Plaintiffs' membership in a protected category, whatever category that may be.

---

[15] Plaintiffs and the Partnership dispute the sufficiency of the Plaintiffs' allegations regarding the existence of federal funding, which is a requirement for a Title VI action. (*Compare* Mem. Supp. Partnership's Mot. Dismiss 15 ("Nothing in the [Plaintiffs'] complaint alleges that the Housing Partnership received federal funding, directly or indirectly.") *with* Pls.' Mem. Opp'n Def. Partnership Mot. Dismiss 12 ("[P]laintiffs did state that federal funds were involved in the complaint . . . .").) Yet assuming, *arguendo*, that Plaintiffs adequately pled the federal funding element of a Title VI action, the claim fails for the same reasons it fails against the City. *See supra* Part II.

17

To the extent they do, such conclusory allegations, merely tracking statutory language, are insufficient to survive a motion to dismiss.  *See Fonte v. Bd. of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988) ("If a civil rights complaint is to survive a motion to dismiss, it must make specific factual allegations indicating a deprivation of rights."); *Martin v. N.Y. State Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir. 1978) ("It is well settled in this Circuit that a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6).").  Plaintiffs have failed to satisfy even their minimal burden at the pleading stage.  Therefore, the Court dismisses Plaintiffs' cause of action based on the Civil Rights Act (the "Ninth Cause of Action").

## III.  State Law Claims

The Court has now dismissed all federal claims, leaving only state claims, which are asserted against all defendants.  Pursuant to 28 U.S.C. § 1367(c), the Court may decline to exercise pendent jurisdiction over these claims.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *Sadallah v. City of Utica*, 383 F.3d 34, 39–40 (2d Cir. 2004) (citing *Gibbs* in directing district court to enter judgment for defendants on federal law claims and to dismiss any state law claims without prejudice); *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) ("'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise

jurisdiction over the remaining state-law claims.'") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). This lawsuit is, at its core, a contract dispute between homebuyers and a developer who sold them substandard housing. Plaintiffs appear to have broadened their aim because the developer defendant declared bankruptcy. While the Court is sympathetic to the unfortunate situation in which Plaintiffs find themselves, such a claim is not, as alleged, constitutional and instead belongs in state court. Accordingly, Plaintiffs' remaining state law claims against all defendants are hereby dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the motions to dismiss of the City, the Partnership, and Danois **[17, 21, 25]** are GRANTED and Plaintiffs' Complaint is dismissed in its entirety. The Partnership's cross-motion for attorney's fees is DENIED. The Court must also consider whether to grant Plaintiffs leave to amend their Complaint. *See Van Buskirk v. New York Times Co.,* 325 F.3d 87, 91 (2d Cir. 2003) ("[I]t is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff leave to file an amended complaint."). The Court declines to grant Plaintiffs leave to amend their due process claim, as Plaintiffs' injuries do not amount to a due process violation and amendment would be futile. *See Jones v. N.Y. State Div. of Military and Naval Affairs*, 166 F.3d 45, 50 (2d Cir. 1999) ("[A] district court may properly deny leave [to amend] when amendment would be futile."). While the Court has serious reservations whether Plaintiffs can, in good faith, correct the deficiencies in the equal protection and Title VI claims as described herein, the Court grants Plaintiffs leave to amend those federal claims. Plaintiffs have thirty days from the date of this

Memorandum Opinion and Order to file an amended complaint. Should an amended complaint be filed and survive a renewed motion to dismiss the federal claims, the Court will at that time reconsider its ruling as to the pendent state law claims.

SO ORDERED.

Dated: New York, New York
March 26, 2008

_____
Richard J. Holwell
United States District Judge